Filed 9/21/16  P. v. Gudino CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | F071563 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 07CM7087) |
| VICTOR GUDINO, | **OPINION** |
| Defendant and Appellant. | |

### THE COURT[*]

APPEAL from an order of the Superior Court of Kings County.  James LaPorte, Judge.

Three Strikes Project, Stanford Law School, Susan Leah Champion and Michael Stone Romano, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Stephen G. Herndon, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]      Before Poochigian, Acting P.J., Detjen, J. and Smith, J.

Appellant Victor Gudino appeals the denial of his petition for recall of sentence pursuant to Penal Code section 1170.126.[1]  Appellant is currently serving a sentence of 25 years to life for possession of a weapon while confined in a penal institution (§ 4502, subd. (a)).  Appellant contends the trial court erred in concluding he was ineligible for resentencing because the record compels a finding he was not armed with a deadly weapon.  For the reasons set forth below, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

On December 19, 2007, a jury found appellant guilty of unlawfully carrying "upon the person a sharp instrument or a slungshot" under section 4502, subdivision (a).  The jury further found true allegations that appellant had suffered two prior convictions, one in 1999 under section 245, subdivision (a)(2), and the other in 1995 under sections 664 and 211.  At the same time, however, the jury found appellant not guilty "of committing an assault upon Jaime Cuevas with a deadly weapon, to wit, a sharp instrument or a slungshot, or by means of force likely to produce great bodily injury" under section 4501.  Similarly, the jury found not true the allegation that appellant "personally inflicted great bodily injury upon Jaime Cuevas" under section 12022.7, subdivision (a).  Appellant was subsequently sentenced to a term of 25 years to life under the three strikes laws in effect at the time.  On appeal, we upheld appellant's conviction.

On November 4, 2014, appellant filed a petition for recall of sentence pursuant to section 1170.126.  Noting the facts contained in our unpublished opinion from appellant's prior appeal,[2] the trial court ordered additional briefing regarding whether appellant had "intent to cause great bodily injury" or was "armed with a deadly weapon" during the commission of his current conviction.  Following this briefing, the trial court concluded

---

[1]    All statutory references are to the Penal Code unless otherwise noted.

[2]    *People v. Gudino* (Sept. 26, 2008, F054876) [nonpub. opn.].

appellant was not statutorily eligible for recall of his sentence because the facts supported his conviction and demonstrated appellant was armed with a deadly weapon. This appeal timely followed.

Because the trial court and the parties rely extensively on the facts detailed in our unpublished opinion from appellant's prior appeal, we include those facts in full for context:

"At 5:50 a.m. on September 15, 2006, correctional officer Enrique Chavez of Corcoran State Prison was in his office when he heard a door banging and someone calling for an officer. Chavez could tell the noise came from B section and followed the sound to cell 34. Through a small side window, Chavez saw Jaime Cuevas and Gudino standing next to their bunks. Cuevas was distressed, breathing heavily and seemed frightened.

"Cuevas told Chavez there was a misunderstanding and everything was fine. Gudino appeared calm. Chavez did not notice any injuries. Cuevas told Chavez that he needed to come out of the cell. As Chavez went downstairs to retrieve a key from the key booth operator, he heard a commotion and banging like two inmates fighting and ran back to the cell.

"When Chavez looked back into the same cell, the lights were off and he could not see anything. Chavez pulled out a flashlight and saw Cuevas and Gudino facing each other throwing punches to their faces, upper torsos, and chests. Chavez ordered them to stop fighting before spraying both inmates with pepper spray.

"Chavez did not initially see any weapons. After Gudino turned on the lights, Chavez could see that Cuevas had red marks on his face and chest and a laceration on his chest down to his stomach. Cuevas had a lot of blood on his chest and shoulder. Gudino and Cuevas were then placed in handcuffs. The laceration on Cuevas's chest was between 20 and 24 inches long. Cuevas was taken to a prison hospital.

3

"Cuevas had convictions for assault, carjacking, and second degree robbery. Gudino was Cuevas's cellmate at Corcoran. The morning of the attack, Cuevas was awakened by a bad burning pain in his back. When Cuevas awoke, he saw Gudino who started swinging at Cuevas. Gudino was holding a sock full of soap and a blade. The blade was the kind used for shaving and Cuevas remembered it had a handle.

"Cuevas began calling and screaming for help. Cuevas was bleeding from his stomach. Cuevas told the correctional officer that he had to get out of the cell. The correctional officer left for a few minutes before returning. Cuevas argued with Gudino, who rushed Cuevas attempting to cut him up more. Cuevas was trying to get away from Gudino who still had the blade. The correctional officer pepper sprayed Cuevas and Gudino when he returned. Cuevas had seen the blade before under his own mattress but denied that it belonged to him. Cuevas acknowledged he did not initially tell authorities that he saw a blade because he was scared.

"In September 2006, Cuevas was taking medication for psychological problems. Cuevas was going to the psychiatric facility in Corcoran after the incident. Cuevas said he had never been found incompetent to stand trial. Cuevas wanted to change cells because Gudino would boss him around and made Cuevas feel disrespected. Gudino would whisper into Cuevas's ear. Before the incident, Cuevas had a feeling something was going to happen.

"Cuevas was cut on his shoulders, back, stomach, and chest. Cuevas received 10 to 20 stitches on his back and about 20 stitches on his stomach. Cuevas saw Gudino flush the blade down the toilet.

"Matthew H. Bejarano, Jr., is a correctional officer with the prison's Investigative Services Unit and is responsible for investigating crimes within the prison. Bejarano watched Cuevas being removed by gurney after the attack. Bejarano took photographs of Gudino and then of the cell area. The photographs depicted blood stains on the wall,

4

showing a possible struggle.  There were blood stains on a shirt, above Gudino's bunk, on Cuevas's bed sheets, and at the foot of Cuevas's bed.

"Robert Adame, another investigating officer, collected a white sock containing a bar of soap from the cell.  Medical Technical Assistant Rolando Pobleto, LVN, examined Cuevas's injuries.  Cuevas was bleeding profusely so Pobleto called an ambulance.  Pobleto believed the injuries were caused by a sharp object.  Pobleto also examined Gudino that day.  Gudino had superficial scratches and a cut lip.

"David Ruiz, a correctional lieutenant, inspected Gudino's hands and saw cut marks on the inside of his hands consistent with having a blade used to slash or stab.  Because inmate weapons do not have stops, when they are used the inmate's hand will slip up the blade and the inmate will cut himself.  When Ruiz observed Cuevas's injuries, it was clear, given the length of the wound, that Cuevas had suffered deliberate slashing.  There were multiple slashes made over and over again in one area.  Ruiz described the attack as 'real violent.'

"Gudino had packaged up his personal property in preparation for a cell search.  A bloody sheet had been folded.  Based on his observations of the cell and the inmates, Ruiz identified Gudino as the suspect and Cuevas as the victim.  Gudino could have suffered injuries to his hands if he was holding a weapon to defend himself or to be aggressive.

"Ruiz believed Gudino initially attacked Cuevas by slashing his back.  Ruiz explained that there was a sock found in the cell that was tied up in a knot and state-issued soap caked up together.  Soap placed in the sock can be used as a sling with which an inmate can hit others.  Ruiz testified that soap in the sock could be used as a weapon, a sling or a slungshot.  The slungshot is usually made with hardened pieces of soap inside a sock.  This type of weapon causes serious bruising and injury.[3]  Gudino did not have any

---

**3**      Exhibits 52 and 53 were photographs of the sock and soap found in the prison cell and were admitted into evidence.

bruising on his body. The jury was shown photographs taken of Gudino after the fight. Ruiz explained that an injury on Gudino's cheek was likely made by a fist.

"The day before the fight, Gudino told Correctional Officer Baer that he had no problems with his cellmate. Baer talked to Cuevas who said he had no safety concerns. The two convinced Baer there were no problems, though Cuevas preferred to be moved into a section with some 'homies.'

"Gudino testified that he shared a cell with Cuevas for 10 or 11 days prior to the fight. The two agreed to be cellmates. Gudino, however, described Cuevas as 'fucked up.' Casual conversation upset Cuevas. Cuevas accused Gudino of whispering into his ear. Gudino asked Cuevas what was wrong with him. Gudino asked Cuevas if he needed medication and told him to take his medication because Cuevas was under the impression he could not take it.

"On the morning of September 15, 2006, Gudino woke up, washed up, and put his things away. Gudino told Cuevas to go ahead, meaning he could use the facilities. Gudino said that Cuevas jumped out of bed and attacked him, hitting him several times using the sock later found on the cell floor. The two men exchanged blows. Cuevas threw Gudino's television at Gudino. It was then that the correctional officer came to the cell door.

"Gudino was trying to wash his face after the correctional officer initially left. Cuevas was digging in his bed. The two struggled, ending up by the door. Gudino grabbed Cuevas and then saw a small blade in Cuevas's hand. Cuevas dropped the blade and Gudino picked it up. Cuevas quickly grabbed Gudino. Cuevas still had a hold on Gudino. Gudino reached up and cut Cuevas who was still fighting. As soon as he was free of Cuevas, Gudino threw the blade down. The two men continued to fight until the officer returned and pepper sprayed them.

"During cross-examination, Gudino said he picked up the blade because he was in fear of his life. Gudino further admitted he cut Cuevas with the blade. Gudino asserted

6

that he just threw the blade to the ground. Gudino denied flushing the blade down the toilet."

## DISCUSSION

Appellant identifies four alleged errors in the trial court's ineligibility determination. The first three are alleged errors of law. For the first, appellant argues the trial court incorrectly concluded that a claim of self-defense is irrelevant to the underlying crime of possessing a sharp object. For the second and third, appellant relies on *People v. Berry* (2015) 235 Cal.App.4th 1417 (*Berry*) to argue the trial court improperly relied upon "acquitted conduct" to support its determination. The fourth claimed error attacks the ultimate determination. Appellant contends, in part due to the fact appellant was acquitted of assault with a deadly weapon and found not to have inflicted great bodily injury, that the facts supporting appellant's possession conviction cannot support an ineligibility finding. In resolving this fourth point below, we will discuss and resolve appellant's legal arguments.

### *Standard of Review and Applicable Law*

" 'On November 6, 2012, the voters approved Proposition 36, the Three Strikes Reform Act of 2012, which amended [Penal Code] sections 667 and 1170.12 and added [Penal Code] section 1170.126 (hereafter the Act) …. The Act … created a postconviction release proceeding whereby a prisoner who is serving an indeterminate life sentence imposed pursuant to the three strikes law for a crime that is not a serious or violent felony and who is not disqualified, may have his or her sentence recalled and be sentenced as a second strike offender unless the court determines that resentencing would pose an unreasonable risk of danger to public safety. (§ 1170.126.)' " (*People v. Osuna* (2014) 225 Cal.App.4th 1020, 1026 (*Osuna*).)

To qualify for resentencing, a petitioner must satisfy three criteria. (§ 1170.126, subd. (e)(1)-(3).) Pertinent to this appeal, the petitioner's current sentence must not be imposed "for any of the offenses appearing in clauses (i) to (iii), inclusive, of

7

subparagraph (C) of paragraph (2) of subdivision (e) of Section 667." (§ 1170.126, subd. (e)(2).)  As applied to the Act, clause (iii) of subparagraph (C) of paragraph (2) of subdivision (e) of section 667 requires considering whether the petitioner "was armed with a firearm or deadly weapon" during the commission of the relevant offense.  (§ 667, subd. (e)(2)(C)(iii).)

The trial court is tasked with determining whether a petitioner is eligible for resentencing.  (§ 1170.126, subd. (f).)  "[A] trial court need only find the existence of a disqualifying factor by a preponderance of the evidence."  (*Osuna*, *supra*, 225 Cal.App.4th at p. 1040.)

As the trial court's eligibility determination is factual in nature, we review that determination for substantial evidence.  (*People v. Hicks* (2014) 231 Cal.App.4th 275, 286; *People v. Bradford* (2014) 227 Cal.App.4th 1322, 1331 (*Bradford*); *see also People v. Woodell* (1998) 17 Cal.4th 448, 461 [in determining whether prior offense was qualifying for 3-strikes review, "a reasonable trier of fact could find beyond a reasonable doubt that the North Carolina trial court impliedly found that defendant was convicted of the assault because of his personal use of a deadly weapon, and not because of vicarious liability for weapon use by some third party"].).

## *Substantial Evidence Shows Appellant Was Armed with a Deadly Weapon*

Given that our review focuses upon whether substantial evidence supports the trial court's ultimate determination, we consider whether appellant was armed with a deadly weapon under the facts properly before the trial court.  Appellant, relying on the purported impact of his legal arguments and the jury's verdict, contends the evidence does not support a finding appellant was armed with a deadly weapon.  We disagree.

*Substantial Evidence Supports the Conviction for Possessing a Sharp Object*

Our opinion from appellant's direct appeal confirms appellant was convicted of possessing either a sharp blade, a slungshot, or both items while confined in a penal institution.  As we explained in a footnote at the time, the jury verdict did not make clear

"whether the jury unanimously agreed that [appellant] possessed a slungshot, a sharp instrument, or both a slungshot and a sharp instrument. There was substantial evidence that [appellant] possessed a sharp instrument given the lacerations on the victim's body and the cuts on [appellant's] hand. There is also evidence from [the victim's] testimony that [appellant] attached the sharp instrument to the slungshot."

Appellant did not challenge this conclusion in his original appeal. In fact, appellant's argument on appeal suggested his conviction for possessing a sharp object was supported by substantial evidence.[4] However, in this appeal, appellant contends the "upshot of the jury's verdicts and this Court's 2008 opinion is that [appellant] was convicted and sentenced for possession of the slungshot in Count II" and that it would require "an irrational chain of inferences" to conclude otherwise. We disagree.

We first consider one of appellant's claims of legal error. The trial court concluded appellant's conviction covered possession of a sharp object despite his acquittal for assault, noting that "[b]ecause the intent or purpose for which the weapon was possessed is not relevant to his Section 4502 [possession of a weapon] conviction, the fact that [appellant] was acquitted of assault is irrelevant to the question of whether he was 'armed with a firearm or deadly weapon' during the commission of his third-strike offense." Appellant argues this conclusion is legally flawed. We do not agree. The statement is merely incomplete, relying on a citation to, rather than an exposition of, the law underlying the conclusion.

---

**4**      In the original appeal, appellant argued the evidence was insufficient to show the sock and soap weapon was a slungshot as a matter of law. Appellant sought reversal because he had been charged with possessing both a slungshot and a sharp object in the same charge, necessitating a unanimous finding that appellant possessed one, the other, or both weapons. As we summarized appellant's argument, "because the jury could have convicted him of possession of a slungshot, his conviction must be reversed." Appellant did not make a similar challenge to his conviction for possession of a sharp object, impliedly conceding the jury could have convicted him on this count.

9

As explained in *People v. Saavedra* (2007) 156 Cal.App.4th 561 (*Saavedra*), and as we noted in our opinion on appellant's original appeal, the case law does support "[a] narrow claim of self-defense" for "an inmate charged with a violation of section 4502 as long as the arming occurs during an altercation and the inmate has not armed himself or herself in anticipation of a future attack." (*Saavedra*, *supra*, 156 Cal.App.4th at pp. 568-569.) But this does not mean that acquittal on the assault charge affects the scope of the conduct supporting the possession conviction, even in light of appellant's self-defense argument. The crime of possession of a sharp object does not require any specific mental state. Thus, the recognition of a self-defense claim does not eliminate any element of the crime. (*Id.* at p. 571.) This supports the trial court's conclusion the defense was inapplicable in this instance, but does not resolve the issue completely.

Having concluded that accepting appellant's self-defense claim does not prevent a finding that appellant committed every element of the possession charge, we must consider whether appellant could present evidence of a self-defense claim that could prevent conviction on the assault charge but permit conviction on the possession charge.

Such a scenario is possible because the burden of proof is different when self‑defense is asserted to a claim of assault with a deadly weapon as opposed to a claim of possession of a sharp object. *Saavedra* recognized that, as a judicially-derived and policy-based defense (*id.* at p. 569) which does not attach to any element of the crime charged, the burden of proof for self-defense claims to possession charges "may properly be placed on the defendant," who must "prove by a preponderance of the evidence" that the defense is applicable. *(Id.* at p. 571.) In contrast, for crimes where intent is an element of the crime, constitutional due process concerns place the burden on the People to disprove a self-defense claim, as the People must show guilt beyond a reasonable doubt on each element. (*Id.* at p. 570.)

In light of this difference in where the burden of proof rests, it is possible the jury could return a not guilty verdict on the assault charge but a guilty verdict on the

10

possession of a sharp object charge. The jury would merely have to conclude that appellant's claim of self-defense raised a reasonable doubt as to appellant's intent to commit assault with a deadly weapon while simultaneously failing to find appellant had proven self-defense on the possession charge by a preponderance of the evidence.[5] As a not guilty verdict confirms only that the People have not proven their case, there is no basis to believe the jury must have convicted only on possession of a slungshot where substantial evidence supports a finding appellant was also in possession of a sharp object. (*People v. Lloyd* (2015) 236 Cal.App.4th 49, 62.) Because such a scenario is possible, the trial court was correct that the self-defense claim in this case was irrelevant to the possession charge. We therefore affirm our prior opinion's conclusion that substantial evidence supports the conviction for possession of a sharp object.[6]

*The Blade Was a Deadly Weapon and Appellant Was Armed Under the Act*

Having confirmed substantial evidence supports the conclusion appellant was convicted of possessing a sharp instrument and that the jury's acquittal on the assault claim was no bar to convicting appellant of possessing a sharp object, we next consider whether that sharp object was a deadly weapon and, if so, whether appellant was armed with it. We conclude substantial evidence supports an affirmative finding in both instances.

---

[5]    As appellant noted in his brief, we recognized in appellant's appeal that substantial evidence supported his argument for self-defense. However, substantial evidence is merely evidence upon which a verdict could be based. (*People v. Rangel* (2016) 62 Cal.4th 1192, 1212-1213.) The existence of substantial evidence supporting a position does not demonstrate, therefore, that the jury accepted and relied upon the evidence.

[6]    Although the full instructions given to the jury on self-defense are not contained in the record, we note that *Saavedra* issued prior to the start of appellant's trial and self-defense instructions were provided on the charge of possessing a sharp object to the effect that appellant was not guilty if he "used force against another person in self-defense."

11

When an object is not considered a deadly weapon as a matter of law, the fact finder must determine whether the object was possessed or used in such a manner that it should be considered a deadly weapon under the circumstances. (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028-29.) "In making this determination it may be necessary to consider 'the attendant circumstances, the time, place, destination of the possessor,' any alteration of the object, and other relevant facts indicating 'the possessor [would] use it as a weapon should the circumstances require.' " (*Bradford*, *supra*, 227 Cal.App.4th at p. 1342.)

In this case, the facts include Mr. Cuevas's testimony that appellant attacked him with a blade, that he saw appellant flush this blade down the toilet, and that the blade may have been attached to the slungshot; officer testimony as to the slashing injuries sustained by Mr. Cuevas and to the wounds on appellant's hands which could be considered consistent with offensive or defensive use of a blade; officer testimony that appellant suffered no bruising and only had cuts to his hands while Mr. Cuevas suffered substantial bruising and major lacerations; and appellant's own testimony that he picked up the blade during the fight and used it to defend himself.

Our Supreme Court has affirmed that a razor blade in the possession of an inmate is a deadly weapon, explaining that even "without a handle, a razor blade could be used to slice a victim's throat, wrist, or other vital spot, and thus a detached razor blade has a reasonable potential of causing great bodily injury or death." (*People v. Pollock* (2004) 32 Cal.4th 1153, 1178.) And one is "armed" in the context of the Act if the deadly weapon is simply "available for offensive or defensive use." (*Osuna*, *supra*, 225 Cal.App.4th at p. 1029.) Accordingly, the fact that appellant was in a correctional facility when the blade was found, along with the nature of the blade itself, and the evidence it was used as a weapon by appellant, provides sufficient evidence of the attendant circumstances, alteration of the object, and other facts indicating the possessor would use

it as a weapon should the circumstances require, to find the razor blade was a deadly weapon and that appellant was armed with the blade.

*Appellant's Acquittal Does Not Eliminate the Factual Basis for the Ineligibility Finding*

Appellant further contends that the factual basis for the above conclusion cannot stand in light of the jury's not guilty findings in appellant's original trial. Citing *Berry*, *supra*, 235 Cal.App.4th at p. 1428, appellant argues it is inappropriate to consider any facts related to appellant's use of the blade in self-defense because appellant was acquitted of assault with a deadly weapon. We do not agree.

Appellant overreaches with respect to the holding in *Berry*. In that case, Mr. Berry pled guilty to possessing a fraudulent check and a forged driver's license. (*Berry*, *supra*, 235 Cal.App.4th at p. 1420.) In exchange, the People dismissed several charges alleging Mr. Berry had been in possession of a firearm. (*Id*. at pp. 1421-1422.) When Mr. Berry sought to recall his sentence, the trial court relied on facts related solely to the dismissed charges to conclude appellant was armed with a deadly weapon when he possessed the fraudulent check and driver's license. (*Id*. at pp. 1425-1426.) The *Berry* court concluded this was improper because "the trial court went outside defendant's 'record of conviction' when it based its assessment of defendant's eligibility for resentencing on evidence of firearm possession that was wholly unrelated to the counts on which defendant was *convicted*." (*Id*. at p. 1427.)

Thus, *Berry* excludes consideration of facts wholly related to dismissed or acquitted claims but not facts relevant to both convicted and acquitted claims. (*Berry*, *supra*, 235 Cal.App.4th at p. 1428.) In other words, it is not the conduct itself that is the focus of the inquiry, but the claims under which the disputed conduct is relevant. *Berry* itself makes this distinction clear, explaining that "while such an arming analysis might have been appropriate in a case where the defendant's conviction and sentence were based—at least in part—on his *possession* of a firearm [citations], it was not appropriate

here, where all allegations involving firearm possession were dismissed as part of defendant's plea agreement." (*Berry*, *supra*, 235 Cal.App.4th at p. 1426.)

This case falls within the scenario envisioned in *Berry*. Appellant was charged with possessing a sharp object in a correctional facility. The fact that appellant had wounds consistent with possessing the object, caused injuries consistent with wielding the object, was seen with the object, and admitted to possessing the object all relate directly to the possession charge. That these facts also relate to the assault charge does not negate their applicability to the inquiry in this case. The trial court did not exceed appellant's record of conviction by considering them and we therefore conclude substantial evidence supports the trial court's ineligibility determination.

## DISPOSITION

The judgment is affirmed.

14